UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
THOMAS G. ROONEY,                   )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )   Civil Action No. 10-11601-DJC
                                    )
MICHAEL J. ASTRUE,                  )
COMMISSIONER, SOCIAL SECURITY       )
ADMINISTRATION                      )
                                    )
        Defendant.                  )
_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    December 5, 2011

### I.     Introduction

Plaintiff Thomas G. Rooney ("Rooney") filed a claim for supplemental security income ("SSI") with the Social Security Administration. Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Rooney now brings this action for judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on April 7, 2010, denying Rooney's claim.

Before the Court are Rooney's Motion to Reverse or Remand the ALJ's decision and the Commissioner's Motion to Affirm that decision. In his motion, Rooney claims that the ALJ erred in denying his claim because: I) the ALJ failed to inquire about and consider the disability rating of the Veteran Administration ("VA") for Rooney's claimed vision impairment; and ii) the ALJ

1

failed to contact the treating physician to clarify the basis of his opinion before disregarding it as ambiguous or unsupported. Because the ALJ adequately considered Rooney's claimed vision impairment and because the treating physician's opinion was internally inconsistent and inconsistent with the record as a whole, the Commissioner's final decision is AFFIRMED.

## II.     Factual Background

Rooney was 48 years old when he ceased working on August 8, 2007 to care for his mother. See R. 130.[1] On September 11, 2007, while still caring for his mother, Rooney suffered a back injury, rendering him unable to return to work. R. 130, 147. He had previously worked as a marine mechanic, deli clerk and self-employed contractor. R. 131. In his November 19, 2007 application for SSI with the Social Security Administration ("SSA"), R. 125, Rooney alleged disability due to his back injury, hearing loss in his left ear and inflammation of his left eye. R. 125–130.

## III.    Procedural Background

Rooney filed a claim for SSI with the SSA on November 19, 2007 asserting that he was unable to work as of September 11, 2007. R. 107. After initial review, his claims were denied on February 8, 2008. R. 60–62. His claims were reviewed by a Federal Reviewing Official and again denied on October 31, 2008. R. 53–59. On December 23, 2008, Rooney filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R.70–72. A hearing was held before an ALJ on January 22, 2010. R. 25. In a written decision dated April 7, 2010, the ALJ determined that Rooney did not have a disability within the definition of the Social Security Act and denied Rooney's claims. R. 8.

---

[1]Citations to the administrative record in this case, Docket No. 9, shall be to "R. __."

Although the ALJ notified Rooney that the SSA's Decision Review Board selected his claim for review, R. 4, the Board did not complete its review of Rooney's claim during the requisite time period. R. 1. Accordingly, the ALJ's decision is the Commissioner's final decision. 20 C.F.R. § 405.420(a)(2); Lappen v. Astrue, 2011 WL 2424273, at *1 (D. Mass. June 17, 2011).

## IV. Discussion

### A. Legal Standards

#### 1. Entitlement to Supplemental Security Income

A claimant's entitlement to SSI turns in part on whether he has a "disability," defined in the Social Security context, as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(I), 423(d)(1)(a); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do his or her previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The Commissioner must follow a five-step process when he determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted. 20 C.F.R. § 416.920. All five steps are not applied to every applicant; the determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the

application is granted. Id. Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he or she can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given his or her RFC, education, work experience, and age, is unable to do any other work, the application is granted. Id.

### 2. Standard of Review

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

## B. Evidence before the ALJ

### 1. Medical History

There was considerable evidence about Rooney's medical history before the ALJ, including diagnoses and treatment, particularly in regard to the conditions upon which Rooney relied in claiming a disability in his application for benefits. Rooney claimed a "back injury, hearing loss in [his] left ear, and inflammation in [his] left eye" as his primary impairments. R. 130. The ALJ defined Rooney's medical impairments as myofascial pain syndrome, cognitive disorder and adjustment disorder. R. 9. On appeal, Rooney now disputes the ALJ's consideration of his claimed

4

eye impairment and cites the ALJ's failure to contact Rooney's treating physician regarding his opinion, namely his RFC assessment and diagnosis of Rooney's medical condition.

### a. Back Injury

On October 29, 2007, Rooney visited the emergency room after falling backwards down a set of stairs four days before. R. 215. His chief complaint was back pain. Id. After extensive examination, doctors concluded that he suffered no back injury and that he had no signs of pain in the area of his back overlying the kidney, even though a right joint in Rooney's pelvic region was tender. R. 214. Five views of Rooney's spine during a cervical spine exam revealed some minor degenerative changes but nothing abnormal. R. 203. He was released from the hospital that same day. R. 217. On November 7, 2007, Rooney returned to the emergency room, again complaining of back pain. R. 200. Examination of Rooney's lower spine showed normal alignment; his soft tissues were normal. R. 198. Again, tests showed that Rooney had no signs of pain in the area of his back overlying the kidney. R. 201. He was released from the hospital the same day. R. 219.

Dr. Mohammad Hakim, Rooney's primary care physician, referred Rooney to Dr. Anatoly Shalnov, M.D., a specialist in orthopedic medicine. R. 275. During Rooney's first visit on December 21, 2007, Dr. Shalnov observed that Rooney was not in distress; his gait was slightly asymmetrical, but the range of motion in all of his upper and lower limb joints was functional. Id. An inspection of his lower back revealed no obvious deformities. Id. Dr. Shalnov did note some tenderness along Rooney's lower spine and in the muscles next to his spine, but recommended physical therapy and referred Rooney for an X-ray and an MRI, combined with usage of the prescription drug Ultram to resolve Rooney's pain. Id.

An MRI of Rooney's lower back revealed a small disc extended out around his abdominal

region, but it did not reveal any significant spinal stenosis[2] or compression of the nerves in his spine. R. 274. Dr. Shalnov saw Rooney again on January 9, 2008 and noted that Rooney had not followed his advice of scheduling a physical therapy session. R. 272. Although Dr. Shalnov noted some tenderness in the lower back spinal area, Rooney's X-ray was normal and he was not in distress. Id. On February 20, 2008, Dr. Shalnov again examined Rooney and noted he had only attended physical therapy once since his last visit. R. 271. An MRI of his lower back did not reveal any significant spinal narrowing and Dr. Shalnov believed Rooney to be exaggerating his symptoms. Id. (noting that Rooney "appear[ed] [to] magnify his symptoms"). Dr. Shalnov discouraged over-medication and recommended Rooney attend physical therapy on a continuous basis. Id.

On March 17, 2008, Dr. Hakim completed an RFC assessment for Rooney in which he diagnosed Rooney with spinal stenosis and deemed him disabled from "competitive substantial gainful employment." R. 377. However, on the occasions that Dr. Hakim examined Rooney, the physical exams were normal. R. 303, 311, 314, 317. Dr. Hakim reported that Rooney appeared alert and oriented and prescribed him medication for back pain and referred him to specialists to assess his symptoms. R. 311, 314. Dr. Shalnov saw Rooney again on March 19, 2008. R. 270. Dr. Shalnov noted that not much in Rooney's condition had changed, but he noted it unlikely that Rooney was following his home exercise program. Id. He determined that Rooney's presentation during appointments did not correlate with clinical or radiological findings, but decided to proceed with epidural injections in joints in Rooney's spinal and abdominal region to help relieve his pain. Id. Rooney reported to Dr. Shalnov that he did not receive any benefit from the injection, at which

---

[2]Spinal stenosis is the narrowing of one or more areas in the spine that can occur in the neck or back region. If this narrowing occurs, it can place pressure on the spinal cord or nerves at the level of compression. See Spinal Stenosis Definition, MAYOCLINIC.COM, http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last visited Nov. 18, 2011).

point Dr. Shalnov recommended aquatherapy. R. 267. Dr. Shalnov understood Rooney's syndrome as myofascial (muscle pain). Id.

On August 11, 2008, Dr. Kirby von Kessler, a specialist in orthopedic surgery, reviewed the available medical reports and concluded that there was no determinable medical origin for Rooney's complaint of back and muscle pain. R. 276. On September 30, 2008, Dr. Magaly Noel, a specialist in orthopedic medicine, evaluated Rooney and found that tests of his lower back were normal. R. 308. While there was a small disc extended out around his abdominal region, there was no compression of the nerves in Rooney's spine. Id. Dr. Noel recommended that Rooney participate in physical therapy consistently and continue taking medication as prescribed. R. 308.

Dr. Hakim saw Rooney on November 10, 2008 and noted tenderness in his abdominal region and muscles around his spine, but also stated that Rooney had good leg muscle strength. R. 303. He noted that Rooney was suffering from spinal stenosis and mentioned that Rooney also had appointments with orthopedics for further examination. Id. Dr. Noel saw Rooney again on subsequent occasions, during which she recommended only physical therapy as treatment and either decreased or discontinued use of Percocet, another medication that Dr. Hakim prescribed Rooney, R. 312, since Rooney's tests continued to be normal and his gait was fairly normal. R. 282, 297, 335, 337. Dr. Noel's last examination of Rooney occurred on May 8, 2009. R. 335. She did not recommend "long-term narcotic use" for his current pain (e.g., Percocet). Id. Dr. Noel stated that Rooney would benefit from consistent physical therapy and conditioning of pain. Id. Following her assessment, she made no further appointments with Rooney and stated Rooney should make an appointment with her on an as-needed basis. R. 336.

On December 3, 2009, Dr. Hakim completed another RFC assessment and opined that

7

Rooney could lift and/or carry a maximum of five pounds continuously and could occasionally carry up to 10 pounds. R. 379. Dr. Hakim stated that Rooney suffered from spinal stenosis and was disabled from competitive substantial gainful employment. R. 380. However a non-examining physician, Dr. Subbiah Doraiswami, gave an RFC assessment that concluded that Rooney was able to lift and/or carry up to 10 pounds frequently and 20 pounds occasionally. R. 242. He also determined that Rooney could sit, with normal breaks, for a total of about 6 hours in an 8-hour workday, even if he had to alternate between standing and sitting to relieve discomfort. R. 242. Dr. Doraiswami noted that Rooney aggravated his symptoms and was becoming dependent on medication. R. 243. While Dr. Doraiswami noted tenderness in Rooney's lower abdomen around the spine, Rooney's X-rays were normal. R. 242–243.

### b. Hearing Loss in Left Ear

Rooney complained of hearing loss in his left ear on his November 17, 2007 application, but he did not mention any hearing loss during his October 29, 2007 emergency room visit. R. 200–16. Dr. Shalnov's physical examination of Rooney did not reveal any hearing issues. R. 275. Dr. Hakim did not note any hearing difficulties, but instead noted Rooney appeared alert, oriented and cooperative. R. 311. Dr. Noel noted that Rooney had no loss of sensory capacities. R. 308. Dr. Doswaimi also noted that Rooney made no mention of any hearing difficulties during their visit. R. 243.

### c. Inflammation of Left Eye

During his October 29, 2007 visit to the emergency room, Rooney complained of inflammation of his left eye. R. 202. Dr. Shahrooz Hekmatpour, the treating physician, determined that there was swelling around Rooney's left eye and noticed inflamation of Rooney's visual and

8

nasal sinuses. R. 205. Rooney was prescribed antibiotics on his return to the emergency room the next day, but Rooney noted improvement in the inflammation. R. 209.

Dr. Steven Patalano, an ophthalmologist, examined Rooney and determined that he was not visually impaired or disabled. R. 220. Dr. Patalano measured Rooney's best corrected vision as 20/20. Id. Dr. Patalano did note that Rooney had some vision problems in his left eye, but cited glasses for seeing near and distant objects as the appropriate remedy. Id.

### d. Cognitive and Adjustment Disorder

Rooney stated on his disability application that he has difficulty with his memory and problems concentrating. R. 154. Consultive examiner Gregory P. Morin, PhD., met with Rooney on January 19, 2008. R. 233. Rooney stated that he had not had problems with memory or concentration prior to his fall. R. 234. While Dr. Morin did note some difficulties with Rooney's attention and reasoning because Rooney concentrated so much on his back pain, which interrupted Rooney's normal stream of thought, Dr. Morin concluded that Rooney had no underlying thought disorder, nor did he have any long-term memory impairments. R. 233–40. On February 7, 2008, psychologist S. Fischer reviewed Rooney's medical records and offered a mental RFC assessment. R. 249–66. Dr. Fischer noted that Rooney was not significantly limited in his ability to remember locations and work-like procedures, although he did display moderate limitations in his ability to understand and remember detailed instructions. R. 263. The myofascial pain created a mild restriction on Rooney's daily living activities. R. 259. Dr. Fischer determined that Rooney suffered from cognitive disorder and adjustment disorder, but without any marked limitations. R. 261, 263–64.

Dr. Hakim repeatedly made note of Rooney's alert and oriented state. R. 311, 314, 317.

9

Dr. Noel noted Rooney's normal mental status and his appropriate mood. R. 308. Dr. Hakim listed Rooney's neurological exams as normal. R. 314. On an SSA questionnaire, Rooney stated that he engages in the normal activities of walking, shopping, household chores and socializing, R. 148, and he testified that he spends 8 to 10 hours a day watching television. R. 41.

## 2. ALJ Hearing

At the January 22, 2010 administrative hearing, the ALJ heard testimony from Rooney and vocational expert ("VE") Amy Vercillo. R. 25.

### a. Rooney's testimony

Rooney testified that prior to his back injury, he worked as a deli clerk for almost a year, a contractor for six months and a port engineer for three years. R. 32. In between and prior to these jobs, Rooney experienced bouts of unemployment. R. 32–33. Rooney testified that he has been unable to perform any kind of work since September 2007 because he suffers from back, leg and foot pain. R. 33. Among these problems, Rooney testified that "the back is the most aggravating." R. 33. He stated that he is unable to carry anything and has difficulty sleeping. R. 33.

Rooney testified that he had been attending physical therapy for seven months and it helped to alleviate the pain. R. 34–35. He also mentioned that his prescription drugs, Percocet and Tramadol, "take a lot of the pain away." R. 36. He testified that a doctor informed him that the Percocet may have a slight impact on his concentration. R. 36. Regarding a doctor's advice to decrease or discontinue usage of the medication, Rooney testified that he never attempted to cease usage. R. 36. He testified that he received steroid injections, but still experienced pain afterwards. R. 37–38. When asked about his functionality, Rooney claimed that he can walk "about 150 yards" from his house to the local supermarket before he has to stop. R. 38. Additionally, Rooney stated

10

he can stand for "an hour, two hours at most" and that he can stay seated for approximately 15-20 minutes before needing to get up. R. 38. He testified that he is able to lift "five/ten pounds at the most, a bag of potatoes." R. 38.

In addition to his back, leg and foot pain, Rooney testified that he was receiving benefits from the VA based on an eye injury that "qualified for 20 percent disability, which is 243 [dollars] a month." R. 29. For confirmation, the ALJ asked Rooney "[s]o . . . from the 20 percent disability, it's 243 [dollars] a month?," to which Rooney replied "yes." R. 30. Rooney made no mention of further vision impairments or any hearing problems during the hearing. R. 25–49.

Rooney testified that he is still able to function normally in social settings. R. 39–41. He spends most of his day sitting at home, sleeping and watching TV, while sometimes attending family dinners. R. 40–41. In activities around the house, Rooney testified that he is self-sufficient, and for more complicated tasks such as changing the sheets or bringing the trash out, his daughter and his neighbor assist him since he lives alone. R. 39. Rooney stated that the state has not allowed him to renew his driver's license because he has not been able to make child support payments.[3] R. 40. He therefore uses public transportation, without any difficulty. R. 40.

### b. VE's testimony

The VE, Amy Vercillo, testified that she was present during Rooney's testimony and had an opportunity to review the documents included as exhibits. R. 42. She mentioned Rooney's past work as a marine mechanic and as a contractor and classified both as medium skilled occupations. R. 42. She testified that Rooney's employment at a deli slicing meat counted as light and unskilled labor, but since he also unloaded trucks of 50 pounds or more, that counted as heavy and semi-

---

[3] Rooney did not testify that a vision impairment prevents him from driving. R. 40.

skilled labor. R. 43. The ALJ posed the following hypothetical to the VE:

> If we assume an individual of claimant's age, which is 48 to 51 years old, educational background, which is high school graduate and the same work history and we further assume that this individual can lift and carry up to 20 pounds occasionally and 10 pounds frequently; who could stand and walk for six hours a day, who could sit for six hours a day, but had to alternate between sitting and standing every 30 minutes; somebody who could occasionally climb, balance . . . and was capable of doing routine and repetitive work, would this individual be able to perform any of claimant's past work? R. 44.

The VE responded that these limitations would prevent Rooney from performing any of his past relevant work and there would be no transferability of acquired skills. R. 44–45. However, the VE testified that there were jobs in the national economy that Rooney could perform, which would include "light and sedentary, unskilled work" such as bench assembler, machine tender, and packer and sorter. R. 45. The VE clarified that these are all light unskilled jobs. R. 45. The VE further testified that if the same hypothetical claimant could only "lift and carry up to 10 pounds occasionally and less than ten pounds frequently," he or she could still find sedentary, unskilled work such as small product inspector and small product assembler. R. 46. The VE clarified that these are sedentary, unskilled occupations. R. 46. According to the VE, if the same hypothetical claimant's limitations included needing to take unscheduled breaks and/or needing to lie down up to two or three times throughout the workday, then the claimant would be precluded from employment in the unskilled labor market. R. 47.

### 3. Findings of the ALJ

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Rooney has not engaged in substantial gainful activity since November 19, 2007, the application date. R. 9. Rooney does not dispute the ALJ's findings at step one.

At step two, the ALJ found that Rooney had the following severe impairments: myofascial pain syndrome, cognitive disorder, and adjustment disorder. Id. Rooney does dispute the Commissioner's determination regarding Rooney's severe impairments. Pl. Br. 9.

At step three, the ALJ found that Rooney did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 10. Rooney does not dispute the ALJ's findings at step three.

Before reaching his step four finding, the ALJ determined Rooney's residual functional capacity, finding that Rooney "has the [RFC] to perform light work as defined in 20 C.F.R. 416.967(b) except he can lift 20 pounds occasionally and 10 pounds frequently, stand and walk for 6 hours a day, sit for six hours a day, and needs to alternate between sitting and standing every 30 minutes. He may occasionally climb, balance, stoop, kneel, crouch, and crawl but must avoid concentrated exposure to cold, heat, wetness, humidity, noise, vibration, fumes, and hazards. He is limited to routine, repetitive work because of moderate difficulties in maintaining concentration." R. 12. Consequently, at step four, the ALJ determined that Rooney cannot perform any of his past relevant work in construction, as a marine mechanic, or as a deli stock clerk because such work requires medium exertional lifting. R. 16. Rooney disputes the ALJ's RFC assessment, Pl. Br. 12, but does not, however, dispute the ALJ's findings at step four, namely, that Rooney is precluded from performing his past relevant work.

At step five, the ALJ found that despite Rooney's limited physical impairments, Rooney is able to perform other work that exists in significant numbers in the national economy. R. 16. As a result, the ALJ found that Rooney was not disabled since November 19, 2007, his application date. R. 7–17. Rooney disputes this finding. Pl. Br. 9–11.

### C. Rooney's Challenges to the ALJ's Findings

Rooney contends that the ALJ erred by (1) failing to inquire about and consider the VA's disability rating for his claimed vision impairment; and (2) failing to contact Dr. Hakim, his treating physician, for clarification about the basis of his opinion, which stated that Rooney's back impairment precluded him from competitive substantial gainful employment. R. 377, 380. Rooney's first challenge relates to the ALJ's determination at step two and analysis at step four. The second challenge relates to the ALJ's RFC determination and findings at step five. For the reasons discussed below, Rooney's claims fail.

#### 1. Rooney's Vision Impairment

Rooney argues that the ALJ failed to inquire about the VA's disability decision and rating regarding Rooney's vision impairment, Pl. Br. 9, and, as a result, the ALJ ignored that Rooney's alleged vision impairment precluded him from the light work the VE described during her testimony. Pl. Br. 11.

At step two, the ALJ must determine whether a claimant suffers from a "severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities." White v. Astrue, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011) (quoting Bowen v. Yuckert, 482 U.S. 137, 141–42 (1987)). To meet this burden, a claimant must use "objective medical evidence" to demonstrate that his or her condition meets the above standard of severity. White, 2011 WL 736805, at *6 (internal quotations omitted). Here, Rooney has not met this burden and the ALJ was not required to evaluate any alleged limitations associated with Rooney's claimed vision impairment beyond what was in the record.

First, the record does not support a conclusion that any visual impairment suffered continued to affect him by the time he applied for SSI benefits. Rooney listed "inflammation of left eye" as one of his impairments on his November 17, 2007 SSA application, R. 130, but on his October 30, 2007 visit to the emergency room, Rooney noted improvement in the swelling in his eye, R. 209, and ten days later, after examining Rooney's eyes, Dr. Patalano concluded that Rooney was not visually impaired or disabled. R. 220. Rooney points to no other evidence in the record. Accordingly, the record is sufficient to support the ALJ's determination that the eye injury was not a medically determinable impairment under 20 C.F.R. 416.920(a)(4). R. 9.

Additionally, the record shows that contrary to Rooney's assertions, the ALJ did inquire as to Rooney's vision impairment. The ALJ asked Rooney if he was receiving any benefits, determined that he was receiving disability payments from the VA based on an eye injury and then reconfirmed the dollar amount and percent disability with Rooney. R. 29–30.

Lastly, to the extent that Rooney seeks to rely on the VA's decision, dated October 31, 2008, Rooney is barred from introducing new evidence at this stage unless Rooney can provide good cause for the late entry of evidence that is new and material. See 42 U.S.C. § 405(g). Because Rooney failed to enter the VA's decision into the administrative record, the VA's decision must be barred from consideration. See Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001) (stating that the district court is limited to reviewing ALJ's decision based on evidence presented to the ALJ unless an egregious error has been made).[4]

---

[4] Even if this Court reviewed the VA's decision, it would not aid to Rooney. At the hearing, Rooney testified that he was receiving a 20% disability rating from the VA, R. 29, whereas the VA's written decision reports that Rooney only received a *10%* disability rating. Doc. 13-1 at 1. Furthermore, the VA's rating was based solely on an injury to Rooney's *right* eye, id., whereas in his disability application, Rooney claimed inflammation and infection to his *left* eye. R. 130, 220.

## 2. The ALJ's Consideration of Dr. Hakim's Opinion Evidence

Rooney also contends that the ALJ failed to contact treating physician Dr. Hakim to clarify the basis of his opinion regarding Rooney's functional capacity. Generally, an ALJ must recontact a treating physician if the evidence is "inadequate" for the ALJ to make a disability determination. 20 C.F.R. § 404.1512(e). Here, however the ALJ did not state Dr. Hakim's opinion evidence was inadequate. Instead, the ALJ stated that Dr. Hakim's opinion evidence was not persuasive in light of Dr. Hakim's own treatment notes and the objective medical evidence of the other treating physicians, all of whose notes and evidence were reviewed and taken into account by the ALJ before she made her decision, as statutorily required. 20 C.F.R. 404.1527(d); R. 15. Therefore, the ALJ had adequate evidence to evaluate Dr. Hakim's opinion and was not required to recontact Dr. Hakim.

Rooney further contends that the ALJ disregarded Dr. Hakim's opinion evidence. Generally, an ALJ "must give more weight to the opinions from the claimant's treating physicians, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments." Rodriguez v. Astrue, 694 F.Supp.2d 36, 42 (D. Mass. 2010) (internal quotations omitted). However, if the treating physician's medical opinions are internally inconsistent or inconsistent with other substantial evidence in the record, the ALJ may "downplay" the treating doctor's assessment. Arruda v. Barnhart, 314 F.Supp.2d 52, 72 (D. Mass. 2004); see Castro v. Barnhart, 198 F.Supp.2d 47, 54 (D. Mass. 2002) (holding that "the administrative law judge may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-

treating doctors"). Inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ to resolve. Costa v. Astrue, 565 F.Supp.2d 265, 271 (D. Mass. 2008) (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

### a. Granting Controlling Weight to Treating Physicians' Opinions

Dr. Hakim's opinion was not entitled to controlling weight because it was both internally inconsistent and inconsistent with other substantial evidence in the record. Despite his twice-stated RFC assessment regarding Rooney's preclusion from participating in competitive substantial gainful employment, R. 377, 380, Dr. Hakim noted during visits with Rooney, between these two assessments, that Rooney's physical exams were "generally normal" and Rooney appeared "alert and oriented." R. 311, 314. These treatment notes appear to contradict Dr. Hakim's RFC assessment. While Dr. Hakim did mention tenderness around Rooney's lower back area, Dr. Hakim failed to present any objective medical evidence of diagnosis in his treatment notes. R. 311.

The ALJ correctly noted that Rooney is able to carry out significant activities of daily living. R. 13. Rooney's own testimony suggests that he is not precluded from normal daily activities and is able to complete tasks such as cooking for himself, socializing, and grocery shopping. R. 39–41.

Moreover, the medical exams and treatment notes of other physicians such as Dr. Shalnov, Dr. Noel and Dr. Doraiswami reveal no objective medical evidence that would provide for a diagnosis of spinal stenosis, as suggested in Dr. Hakim's RFC assessment. R. 377–380. Dr. Shalnov noted that Rooney was in "no distress" and X-rays were "unremarkable." R. 272. Dr. Noel suggested physical therapy for treatment. R. 335. Dr. Doraiswami concluded that Rooney could occasionally lift 20 pounds. R. 242.

In light of the consistent medical determinations and recommendations of other physicians, Dr. Hakim's unsupported opinion evidence merited diminished probative weight. The ALJ was on firm ground in denying Dr. Hakim's RFC assessment controlling weight due to its internal inconsistencies and extensive inconsistences with other substantial evidence in the record. "It was the duty of the ALJ to resolve [any] conflicts in the evidence," and this Court must defer to the ALJ's judgment as long as it is supported by substantial evidence. Konigsberg v. Astrue, 2010 WL 1794630, at *7 (D. Mass. Mar. 8, 2010) (citing Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)).

### b. Weighing Medical Opinions

If an ALJ decides not to afford a treating physician's opinion controlling weight, he or she must evaluate several factors in deciding how to weigh such a medical opinion: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the relevant evidence in support of the medical opinion; 4) the consistency of the medical opinion reflected in the record as a whole; 5) whether the medical provider is a specialist in the area in which he renders his opinions; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). An ALJ may afford little probative value to a treating physician's opinion as long as he provides a reasonable explanation for doing so and the contrary finding is supported by substantial evidence. See Shields v. Astrue, 2011 WL 1233105, at *7 (D. Mass. Mar. 30, 2011).

First, while Rooney testified that Dr. Hakim has been his primary care physician since childhood, Dr. Hakim only examined Rooney on a few occasions after Rooney's fall and the results of these physical examinations were unremarkable each time. R. 311, 314, 317. While treating

source opinions are generally awarded more weight because they often provide a "longitudinal picture" of a claimant's impairment, see 20 C.F.R. § 404.1527(d)(2), because Dr. Hakim is not an orthopedic doctor, he had to refer Rooney to specialists such as Dr. Shalnov. R. 314. Dr. Hakim's assessments, therefore, do not provide a "longitudinal picture" of Rooney's orthopedic impairment in the same manner that Dr. Shalnov's and Dr. Noel's assessments do, especially given the extensive record of appointments Rooney had with these physicians.

The ALJ also emphasized the lack of supporting rationale in Dr. Hakim's RFC assessment. R. 14. Generally, the more relevant evidence a treating medical source presents, "particularly medical signs and laboratory findings," to support an opinion, or the better an explanation a source provides for an opinion, the more weight an ALJ should give that opinion. 20 C.F.R. § 404.1527(d)(3); Charon v. Astrue, 2011 WL 2268310, at *8 (D. Mass. June 6, 2011). As the ALJ noted, Dr. Hakim does not provide any explanation for his assessment, and there is no evidence in the record that Dr. Hakim relied on any laboratory or clinical findings, diagnostic tests, or any portion of Rooney's extensive medical record. R. 14. Without any underlying explanation for Dr. Hakim's opinion that Rooney is disabled from competitive gainful substantial employment, the ALJ properly emphasized this weakness in Dr. Hakim's assessment.

Further, as this Court has already explained, Dr. Hakim's medical opinions are inconsistent with much of the record as a whole. First, Dr. Hakim's RFC assessment is an outlier. Compare R. 376–80 (stating that Rooney was precluded from substantial gainful employment and diagnosing him with spinal stenosis) with R. 272–76, 297–98, 311, 314, 317, 335 (various RFC assessments concluding that Rooney's X-rays and extensive examinations were normal). Second, the record supports the ALJ's findings, both as to the medical evidence and as to Rooney's daily activities.

19

See, e.g., R. 40, 239–40, 242–43, 268, 271, (showing that Rooney was physically and mentally functional). The record indicates that Rooney is still able to engage in significant activities of daily living, including self-maintenance, taking public transportation, and socializing. R. 39–41. In sum, substantial evidence supports the ALJ's findings and not Dr. Hakim's minority view. See McDougal v. Astrue, 2010 WL 1379901 at *10 (D. Mass. Mar. 31, 2010) (holding that if a treating physician's opinion is inconsistent or unsupported by the record, the ALJ need not give it significant weight).

## V. Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Rooney's motion to reverse or remand is DENIED.

**So ordered.**

                                                  /s/ Denise J. Casper
                                                  United States District Judge